IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Kiesha L. Holmes, et al., | Case No. 3:16 CV 464 |
| Plaintiffs *Pro Se*, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Toledo Gaming Ventures, LLC, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiffs *pro se* Kiesha Holmes and Kohrea McKinney sue Defendants Toledo Gaming Ventures (Hollywood Casino) and Casino Security Manager Milissa Winter for race discrimination in violation of 42 U.S.C. § 1981 and Ohio Revised Code § 4112.02 (Doc. 21). Specifically, Plaintiffs claim Winter discriminated against them by (1) treating them in a "markedly hostile" manner, and (2) ordering them to leave the casino in retaliation for making a complaint of race discrimination by another casino employee (Doc. 21 at 19–21). Defendants move for summary judgment (Doc. 46), Plaintiffs oppose (Doc. 54), and Defendants reply (Doc. 62). This Court held a Record Hearing on April 27, 2017, during which it heard testimony and argument related to the casino surveillance video (Doc. 69). (The video is visual only with no sound.)

## BACKGROUND

The following facts are undisputed, unless otherwise noted. Holmes, her daughter McKinney, and McKinney's fiancé, Dwann Moore, arrived at Hollywood Casino shortly after midnight on January 2, 2016 (Holmes Dep. Tr., Doc. 46-2 at 49). At around 3 AM, they approached the Tarzan slot machine area, but all the slot machines were in use (Doc. 46-2 at 50; McKinney Dep. Tr., Doc.

46-3 at 40). Some casino patrons were playing more than one machine at a time, and others leaned chairs against the machines to reserve them while leaving the slot machine area (Doc. 46-2 at 50–52, 63; Doc. 46-3 at 39–40). Holmes and McKinney observed these practices, as did a white woman who was also waiting for slot machines (Doc. 46-2 at 50; Doc. 46-3 at 38–39). The other woman asked Security Officer Ryan Spencer whether patrons were allowed to play two machines at once (Doc. 46-3 at 39–42). Spencer responded that he believed this was okay, but he would have to check with a manager (Doc. 46-3 at 41–42).

McKinney was standing close enough to hear the conversation between the other woman and Spencer (Doc. 46-3 at 39–40). After Spencer answered the woman's question, McKinney approached him and asked whether patrons were also allowed to lean their chairs against the machines to reserve them (Doc. 46-3 at 40). Spencer responded with a rhetorical question along the lines of "You wouldn't want them to piss on their [sic] self, would you?" -- or perhaps "You wouldn't want nobody [sic] to piss at the machine, would you?" -- apparently suggesting that patrons reserved slot machines in this way while leaving the casino floor to use the restroom (Doc. 46-3 at 40, 42, 45, 56). Spencer walked away, and McKinney reported Spencer's comment to Holmes (Doc. 46-2 at 67–68).

When Spencer returned to the slot machine area a few minutes later, Holmes and McKinney confronted him about his unprofessional behavior. Holmes complained that Spencer had been polite to the white woman but disrespectful to her daughter, who is black (Doc. 46-2 at 67–68, 70; Doc. 46-3 at 48–49). Spencer listened to Holmes' complaint, apologized, and left (Doc. 46-2 at 67; Doc. 46-3 at 49). He then reported to Winter, his manager, and admitted he had used the word "piss" to a customer (Winter Dep. Tr., Doc. 46-6 at 6). Before Winter could discuss the incident further, she was called to the Player Services desk to respond to a customer (Plaintiffs )complaint (Doc. 46-6 at 6).

2

Meanwhile, Holmes, McKinney, and Moore discussed what had happened and decided to make a complaint about Spencer's behavior (Doc. 46-2 at 73; Doc. 46-3 at 54). They approached the Player Services desk, and Winter was called down to the casino floor to speak with them (Doc. 46-2 at 79; Doc. 46-3 at 55). She was accompanied by another security officer (Doc. 46-2 at 81; Doc. 46-3 at 55). Holmes and McKinney claim that Winter seemed agitated, like she "was on a mission" (Doc. 46-2 at 84; Doc. 46-3 at 55). Winter acknowledges she was "aggravated" by her conversation with Spencer about his behavior, but she denies allowing her irritation to spill over into her interaction with Holmes, McKinney, and Moore (Doc. 46-6 at 8).

McKinney described her encounter with Spencer and complained that Spencer had been polite to a white patron but "very rude and disrespectful" to her (Doc. 46-3 at 58). Winter responded that the conduct described by McKinney was inappropriate and unprofessional, and she did not condone his use of the word "piss" (Doc. 46-3 at 58; Doc. 46-6 at 6). Holmes then interjected and explained that "what really bother[ed]" her was how Spencer treated the white patron differently from her daughter, who is black (Doc. 46-2 at 82). The parties dispute the exact wording of Winter's response, but she said either that she was sure Spencer's behavior had nothing to do with race (Doc. 46-2 at 86–87; Doc. 46-3 at 60), or perhaps that the casino does not hire racist individuals because it is a customer service business (Doc. 46-4; Doc. 46-6 at 6). The parties agree that Plaintiffs then replied, in unison, either "of course you would say that" or "of course you don't think it's racist" (Doc. 46-2 at 88; Doc. 46-3 at 60; Doc. 46-4).

The parties also agree that Winter then asked Holmes, McKinney, and Moore to leave the casino. But they vehemently contest how and why she asked them to leave. Holmes and McKinney claim Winter declared "well, since you're going to make it racial, get out" (Doc. 46-2 at 82; Doc. 46-3

3

at 60, 71). They believe Winter ejected them because they made a complaint about racial discrimination. Winter, on the other hand, contends Holmes and McKinney were being loud and drawing attention to the confrontation at the Player Services desk (Doc. 46-6 at 9–10). She says she asked them to leave for security reasons, as Spencer was still scheduled to work for the rest of the night, and she did not want to risk another incident if he encountered Holmes or McKinney again on the casino floor (Doc. 46-6 at 10). She denies saying "if you're going to make it racial, get out" (Doc. 46-6 at 10).

As Holmes, McKinney, and Moore began to walk away, Winter stopped McKinney and asked to see her photo ID (Doc. 46-2 at 87; Doc. 46-3 at 66; Doc. 46-6 at 7). Casino policy requires staff to check the identification of any patron who appears to be under age thirty, though the parties dispute whether Winter explained this policy at the time (Doc. 46-2 at 91, 93; Doc. 46-3 at 68; Doc. 46-6 at 7). McKinney retrieved her driver's license from her purse but did not hand it to Winter. Instead, she held the license up near her face (Doc. 46-2 at 90; Doc. 46-3 at 68–69). Winter contends McKinney held the license so that her finger obscured the photo and date of birth (Doc. 46-6 at 7). After Winter checked McKinney's license, McKinney, before leaving, headed to cash out a gambling ticket (Doc. 46-2 at 95; Doc. 46-6 at 8; *see also* April 27, 2017 Hearing Transcript). Winter and the other security guard accompanied Holmes, McKinney, and Moore to the casino ATM machines (Doc. 46-2 at 103).

While McKinney was cashing out her ticket, Holmes made a comment about knowing brothers in Las Vegas. The parties dispute exactly what was said. Holmes says she asked for Winter's name and told her she planned to report her to the brothers who own the Hollywood Casino in Las Vegas -- believing, mistakenly, that they also own the Toledo establishment (Doc. 46-2 at 98–99; Doc. 46-3

4

at 67, 74). Winter, however, claims Holmes threatened that she knew brothers who would "take care of" Winter (Doc. 46-4; Doc. 46-6 at 6, 8, 11).

Winter and the other security guard followed Holmes, McKinney, and Moore to the exit (Doc. 46-2 at 104). McKinney alleges Winter followed so closely behind her that she "walked up on" McKinney's heels (Doc. 46-3 at 76–77). McKinney also alleges that she turned around and asked Winter not to follow her so closely (Doc. 46-2 at 105; Doc. 46-3 at 76, 78). McKinney claims Winter responded by saying she could do "what she want, how she want, when she want" (Doc. 46-3 at 78). Winter denies these allegations (Doc. 46-6 at 9, 11). The casino surveillance tape does not show Winter walking closely behind McKinney, nor does it show McKinney turning back to address Winter as the group approached the exit (*see* Doc. 66).

Later that day, Spencer received a "verbal counseling" about using professional language when interacting with casino patrons, which was noted to his personnel file (Doc. 46-5; Doc. 46-6 at 12).

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact," such that the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). This Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court does not weigh the evidence or determine the truth of any matter in dispute; rather, this Court evaluates only whether the record contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

**Section 1981 -- Race Discrimination**

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This Court applies the *McDonnell Douglas* burden-shifting framework -- initially developed in the Title VII employment discrimination context -- to Section 1981 claims of race discrimination based on circumstantial evidence. *Christian v. Wal-Mart Stores Inc.*, 252 F.3d 862, 868 (6th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, Plaintiffs must first establish a prima facie case of discrimination. If they are able to do so, the burden of production shifts to Defendants to identify a legitimate, nondiscriminatory reason for the adverse action. *Id.*; *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). Plaintiffs must then demonstrate that the proffered reason is merely a pretext for unlawful discrimination. *Id*.

To establish a prima facie case of discrimination in a Section 1981 commercial establishment case, Holmes and McKinney must show they (1) are members of a protected class; (2) sought to make or enforce a contract for services ordinarily provided by that establishment; and (3) were denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) they were deprived of services while similarly situated individuals outside the protected class were not, and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. *Christian*, 252 F.3d at 872. Holmes and McKinney bring their discrimination claim under the "markedly hostile manner" prong of Section 1981 (Doc. 54-1 at 6). Service is considered "markedly hostile" when it is (1) so contrary to the establishment's financial

interests, (2) so far outside of widely-accepted business norms, and (3) so arbitrary on its face, that it supports a rational inference of discrimination. *Id.* at 871.

The parties do not contest the first two elements: Holmes and McKinney are members of a protected class, and they used and attempted to use the services provided by the casino at the time of the incident. The dispute centers on whether they received those services in a markedly hostile manner which a reasonable person would find objectively discriminatory. Holmes and McKinney point to the following allegations as examples of markedly hostile treatment:

(1) Winter was "rude" and "nasty" to McKinney when directing her to cash out her gambling ticket (Doc. 54-1 at 8);

(2) Winter aggressively followed McKinney to the casino exit, "walking up on her heels," and prompting McKinney to turn and ask Winter not to follow her so closely (Doc. 54-1 at 7);

(3) Winter said, in asking them to leave the casino, "since you're going to make it racial, get out" (Doc. 54-1 at 7).

Defendants deny all three allegations. Construing these disputed facts in favor of Holmes and McKinney, they are still unable to make out a prima facie case under Section 1981 based on markedly hostile treatment. "Section 1981 is not a code of civility for the restaurant or casino industry, but a section of the law prohibiting discrimination based on race." *Moore v. Horseshoe Casino*, 2015 WL 4743804, at *5 (N.D. Ohio 2015) (citing *Miller v. Freedom Waffles, Inc.*, 2007 WL 628123, at *2–4 (W.D. Ky. 2007)). After all, there are "many circumstances where markedly hostile treatment, even in a purportedly service-oriented industry, would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility." *Lizardo v. Denny's, Inc.* 270 F.3d 94, 102 (2d Cir. 2001).

Accordingly, courts examining cases brought under the "markedly hostile manner" theory have typically required "racially charged conduct" to establish a prima facie case of discrimination. *See, e.g.*, *Moore,* 2015 WL 4743804, at *5 (granting summary judgment in favor of casino where "there are no factual allegations suggesting [the conduct] was racially motivated"); *Miller*, 2007 WL 628123, at *4 (granting summary judgment in favor of restaurant where "there is insufficient evidence to conclude that . . . the profanity was based upon a racial animus"). *Cf. Unroe v. Bd. of Educ. Rock Hill Local Sch. Dist.*, 2006 WL 22081, at *16 (S.D. Ohio 2006) (denying summary judgment where school employee said "I don't want them kind around here"); *Leach v. Heyman*, 233 F. Supp. 2d 906, 909–11 (N.D. Ohio 2002) (denying summary judgment where cashier yelled a racial epithet and physically assaulted plaintiff).

The first two allegations cited by Holmes and McKinney, accepted as true, could be evidence of poor customer service. But they are not racially charged, and therefore -- standing alone -- cannot establish a prima face case of discrimination.[1] The third allegation, however, *does* have racial overtones. Holmes and McKinney claim that after they complained to Winter about Spencer's conduct and explained the reasons for their complaint, she responded, "well, since you're going to make it racial, get out." But as the Second Circuit observed under similar circumstances, "an exasperated—even testy—response to a complaint of discrimination" does not necessarily constitute marked hostility. *Lizardo*, 270 F.3d at 102.

In *Lizardo v. Denny's, Inc.*, a group of Asian American customers were waiting to be seated at a Denny's restaurant. One of the customers became annoyed that other restaurant patrons were

---

[1] Further, the second allegation -- that Winter "walked up on" McKinney as she was leaving the casino -- is not supported by the casino surveillance footage.

8

being seated ahead of his group. He complained to the hostess, suggesting she was discriminating against them. *Id.* at 100. Aggravated by the accusation, the hostess responded, "don't even go there." Another member of the party complained, "this is ridiculous," and was escorted out of the restaurant by security. *Id.* Based on these allegations, the Second Circuit held the plaintiffs failed to show they were treated in a markedly hostile manner. *Id.* at 102. Specifically, it noted that the hostess's "exasperated" response to the complaint of discrimination "could easily be viewed as an expression of righteous indignation at even being accused of having such intent, made credible by its very spontaneity." *Id.* at 104 n.4.

Likewise, in this case, Holmes and McKinney fail to establish they were treated in a manner so arbitrary on its face that it supports a rational inference of discrimination. They do not allege Winter raised her voice, used derogatory language, or threatened them with physical violence. As discussed below, the comment at issue ("since you're going to make it racial, get out") *could* be evidence that Winter was aware Holmes and McKinney were making a complaint about race discrimination, and ejected them from the casino as a result. But that does not satisfy the standard for markedly hostile conduct. Because Holmes and McKinney fail to establish a prima facie case of discrimination, this Court does not reach the second and third prongs of the *McDonnell Douglas* analysis. Defendants are entitled to summary judgment on this claim.

### Section 1981 -- Retaliation

The Supreme Court has recognized that Section 1981 encompasses retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). The *McDonnell Douglas* framework also governs the analysis of these claims. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008). To establish a prima facie case of unlawful retaliation, Holmes and McKinney must show (1) they

were engaged in an activity protected under anti-discrimination statutes; (2) Winter was aware of the protected activity; (3) Winter took adverse action against them; and (4) there is a causal connection between the protected activity and the adverse action. *Id.*; *Lindsay v. Yates*, 578 F.3d 407, 418 n.10 (6th Cir. 2009).

Defendants do not contest the first three elements (Doc. 46 at 16). Once again, the dispute centers on the final element -- whether Winter asked Holmes and McKinney to leave the casino *because* they made a complaint of racial discrimination. "Causation is found where the plaintiff 'proffer[s] evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action.'" *Lindsay*, 578 F.3d at 418 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)). Here, Holmes and McKinney offer their testimony that when they explained their complaint about Spencer's behavior, Winter responded, "since you're going to make it racial, get out." This evidence is sufficient for a jury to infer a causal connection between the complaint and the ejection from the casino. *Cf. Robinson v. Paragon Foods, Inc.*, 2006 WL 2661110, at *9 (N.D. Ga. 2006) ("Thornton testified that defendant banned him from the Cairo Huddle House immediately after he complained about the restaurant's alleged practice of allowing white customers to dine in between 2 and 5 a.m. on Sundays, while requiring black customers to wait outside the restaurant and place to-go orders. . . . This evidence is sufficient to raise a question of fact on Thornton's retaliation claim."). Thus, Holmes and McKinney have met their burden to establish a prima facie case.

Defendants identify three nondiscriminatory reasons for asking Holmes and McKinney to leave the casino. First, they contend Holmes and McKinney were being loud and disruptive (Doc. 46 at 13; Doc. 62 at 3). Second, they claim McKinney violated casino policy by failing to fully cooperate with

10

Winter's request to see her driver's license (Doc. 62 at 3–5). And third, they argue Winter reasonably interpreted Holmes' comment about "knowing brothers in Las Vegas" as a threat (Doc. 62 at 5–6).

The burden now shifts back to Holmes and McKinney to demonstrate that these reasons are mere pretext, and Winter's true motive was discriminatory. They can establish pretext by showing that (1) the stated reasons have no basis in fact; (2) the stated reasons were not the actual reasons why Winter asked them to leave the casino; or (3) the stated reasons were insufficient to explain Winter's actions. *Johnson*, 215 F.3d at 573. Defendants concede that the driver's license incident and the comment about brothers in Las Vegas both occurred after Winter asked Holmes and McKinney to leave (*see* Doc. 46-6 at 7; Doc. 62 at 5; April 27, 2017 Hearing Transcript). And Holmes and McKinney deny being loud, argumentative, or otherwise disruptive (Doc. 46-2 at 88; Doc. 46-3 at 52, 64). Though the casino surveillance video depicts most -- if not all -- of the interaction between Winter, Holmes, and McKinney, it does not resolve this question because there is no audio recording. This fact therefore remains disputed. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 437–38 (6th Cir. 2009) (holding plaintiff testimony contesting facts underlying adverse action is sufficient to defeat summary judgment).

Moreover, the evidence Holmes and McKinney cite for their prima facie case -- their testimony that Winter said, "since you're going to make it racial, get out" -- could also support a finding of pretext. Even if a jury credits Winter's testimony that Holmes and McKinney were being loud, they could nevertheless conclude the discrimination complaint was her true reason for asking them to leave. *Id.* at 436 ("[W]hen a '[defendant] . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for [the adverse action],' the

11

[defendant's] actions constitute 'the very definition of pretext.'"). Thus, Holmes and McKinney raise a triable issue of fact as to pretext, sufficient to defeat summary judgment on their retaliation claim.

**CONCLUSION**

Defendants' Motion for Summary Judgment (Doc. 46) is granted in part, as to the Section 1981 race discrimination claim, and denied in part, as to the retaliation claim.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

June 5, 2017